UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Criminal No. 6:18-CR-00033-GFVT-HAI-1 |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | **MEMORANDUM OPINION** |
| | ) | **&** |
| KENNETH SHAVER, | ) | **ORDER** |
| | ) | |
| Defendant, | ) | |
| | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on several housekeeping issues that remain from the final pretrial conference conducted on March 27, 2023. [R. 309.] The United States accuses Kenneth Shaver of murdering Lance Smith while incarcerated at USP McCreary. [R.1 at 1.] Trial is set for April 11. [R. 261.] At the final pretrial conference, the Court considered several motions in limine. [R. 309.] The Court ruled on some and took others under advisement. This order resolves the remaining pretrial issues.

**I**

The Court considered six motions in limine filed by Mr. Shaver and one filed by the United States during the final pretrial conference. The Court denied without prejudice Mr. Shaver's motions to exclude statements of inmate R.W. and evidence of a coded handwritten note. [R. 277; R. 287.] These matters will be better resolved with the context of trial.

From the remaining motions, the Court took four issues under advisement and granted the parties time to fully brief them. [R. 309.] The United States asks the Court to exclude portions of the expected testimony of defense expert Cameron Lindsay. [R. 290.] For his part, Mr.

Shaver seeks to prevent the introduction of prior misconduct that occurred while he was in the custody of the Bureau of Prisons.  [R. 282; R. 294.]  He also challenges the introduction of several photos of the victim.  [R. 283.]  Finally, he moves to exclude a confession that he allegedly gave to inmate J.W.  [R. 278.]  These motions are now fully briefed and ripe for resolution.

## II

### A

Turning first to the Government's motion on defense expert Cameron Lindsay's testimony, the Court will not exclude any of his proposed testimony in advance of trial.  The Government does not seek to completely exclude Mr. Lindsay from testifying.  [R. 290 at 5.]  Rather, it argues that certain portions of Mr. Lindsay's disclosed report should be excluded because they either do not comply with Rule 16(b)(1)(C) or do not satisfy the minimum requirements for expert testimony required by Rule 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, and its progeny.  *See, e.g.*, *id.* at 7 (*Daubert*), 8 (Rule 16); [*see also* R. 290-1 (Mr. Lindsay's report).].

Mr. Shaver's response renders some of these objections moot by agreeing to not elicit testimony on some of the subjects in Mr. Lindsay's expert disclosure.  [*E.g.*, R. 303 at 6.]  And the Government's reply further clarifies the remaining items to which it objects and whether its grounds are *Daubert* or Rule 16.  [R. 321.]  The Court first addresses the remaining *Daubert* issues and then Rule 16.

#### 1

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Rule 702 produces a three-part test for admitting expert testimony. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008). First, the proposed expert must have the requisite qualifications, whether through "knowledge, skill, experience, training, or education." *Id.* at 529 (quoting Fed. R. Evid. 702). Second, the testimony must be relevant, meaning that it "will assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* (quoting Fed. R. Evid. 702). Third, the testimony must be reliable. *Id.*; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993).

The first prong of the test requires courts to ensure, as a threshold matter, that the proposed expert is qualified to render his or her opinion. Here, courts consider not "the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994). This requirement has always been treated liberally, but this "does not mean that a witness is an expert simply because he claims to be." *Pride v. BIC Corp.,* 218 F.3d 566, 577 (6th Cir. 2000) (internal quotations and citations omitted).

Second, district courts "must ensure that the proposed expert testimony is relevant to the task at hand and will serve to aid the trier of fact." *United States v. Smithers*, 212 F.3d 306, 313 (6th Cir. 2000). The Supreme Court in *Daubert* referred to this prong as the "fit" requirement. *See id.*; *Daubert*, 509 U.S. at 591–93. Because "scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes," courts must consider whether a

particular expert's testimony will truly assist the trier of fact to understand the evidence in the case at hand.  *Daubert*, 509 U.S. at 591.

Finally, the Court must determine whether the testimony is reliable.  Rule 702 provides several standards by which a district court, in its gatekeeper role, should gauge the reliability of expert testimony.  A court should look to whether the testimony is based upon "sufficient facts or data;" whether it is the "product of reliable principles and methods;" and whether the expert "has applied these principles or methods reliably to the facts of the case."  *In re Scrap Metal*, 527 F.3d at 529 (quoting Fed. R. Evid. 702).  Additionally, in determining reliability, a district court is to consider "such factors as testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific [or technical] community." *United States v. Langan*, 263 F.3d 613, 621 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 593–94).  The reliability inquiry is a flexible one, and the above factors are not a "definitive checklist or test." *Daubert*, 509 U.S. at 593.

District courts have broad discretion in determining whether a particular expert's testimony is reliable.  *See, e.g.*, *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 672 (6th Cir. 2010); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) ("[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.").  Notably, in exercising this discretion, a court must be careful not "to impinge on the role of the jury or opposing counsel." *Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 377 (6th Cir. 2014).  Instead, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

As his report recounts, Mr. Lindsay has extensive experience working in United States prisons. [R. 290-1 at 9.] He worked for the Bureau of Prisons for twenty years, serving as a warden or associate warden at five federal prisons. *Id.* at 9–10. He has provided expert testimony in twenty-five trials, some before this Court. *Id.* at 7–8. The United States does not argue that Mr. Lindsay should be prevented from testifying entirely. [R. 290 at 5.] It admits that "there are some specific subjects for which Lindsay has the requisite expertise to offer opinion testimony." *Id.* Accordingly, the Court accepts, as it did on a prior occasion, that Mr. Lindsay's experience as a warden will help the jury in this matter. *See Robinson v. Shelby Cnty.*, No. 3:17-cv-00097-GFVT-EBA, 2020 U.S. Dist. LEXIS 42272, at *7 (E.D. Ky. Mar. 11, 2020). Instead, the United States's claims relate to the remaining two prongs.

The Government first takes aim at paragraphs eleven and twelve of Mr. Lindsay's report. [R. 290 at 5.] Therein, Mr. Lindsay discusses the fact that Mr. Shaver declined to provide a statement in the immediate aftermath of Lance Smith's death. [R. 290-1 at 3.] Mr. Lindsay explains that "[n]ot providing a statement subsequent to an act of violence in a high security environment is the rule rather than the exception" because "[r]emaining silent about the subject of a serious assault is to avoid being labelled a snitch in a USP." *Id.*

The Government contends that nothing in Mr. Lindsay's training or experience qualifies him to reliably opine on Mr. Shaver's subjective intent. [R. 290 at 6.] It would not, however, object to a more generalized statement that inmates often decline to provide a statement in the aftermath of a violent attack. *Id.* Mr. Shaver agrees. [R. 303 at 2–3.] He argues that Mr. Lindsay's report does not issue an opinion on Mr. Shaver's subjective intent and that his counsel will not elicit testimony on that issue at trial. *Id.* at 3. By way of reply, the United States

expresses concern that Mr. Lindsay's statements could lead the jury to infer that Mr. Shaver remained silent to avoid being labelled a snitch.  [R. 321 at 2.]

The Court will not exclude this portion of Mr. Lindsay's testimony in advance of trial. Mr. Shaver's attorneys have agreed to not ask Mr. Lindsay about Mr. Shaver's subjective intent. Expert testimony from a witness whose experience differs from that of a lay juror is often used to help a jury understand a criminal culture.  *C.f. United States v. Harris*, 192 F.3d 580, 589 (6th Cir. 1999) (police officer's expert testimony admissible to help a jury understand the common practices of street level drug dealers).  If, in the context of trial, the Government feels that Mr. Lindsay's testimony goes beyond background material for the fact finders, it can object then. [1] But the better cure might be cross-examination or a limiting instruction.  *See Daubert*, 509 U.S. at 596.

Next, the United States objects to Mr. Lindsay's proposed testimony that "[f]or safety and survival purposes in a high security environment, the attitude among inmates is 'go gang or go alone,' indicating there is little choice in the matter."  [R. 290 at 7; R. 290-1 at 3 ¶ 14.]  The Government suggests that there is no meaningful connection between Mr. Lindsay's experience and his conclusion regarding prisoners' common attitudes.  [R. 290 at 7.]  It reasons that, perhaps a former prison warden's experience would allow him to opine on how frequently inmates join gangs, but Mr. Lindsay has no meaningful insight into the actual thoughts of a prisoner.  [R. 321 at 2–3.]

---

[1] The United States makes two related arguments.  It questions the need for Mr. Lindsay's testimony on this matter because it will not introduce evidence of Mr. Shaver's decision to invoke his right to remain silent protected by the Fifth Amendment to the United States Constitution.  The Government also suggests that testimony from Mr. Lindsay on Mr. Shaver's silence would be inadmissible hearsay. [R. 290 at 6.]  It is premature to speculate on whether there will be a foundation for Mr. Lindsay to opine on Mr. Shaver's silence.  These issues are better handled at trial.

This argument misses the mark because Mr. Lindsay's proposed testimony concerns a common practice among inmates rather than their internal, mental impressions. Experts can draw upon their experience and their review of the evidence to make conclusions about the consistency of behavior with the common practices of criminals. *United States v. Dunnican*, 961 F.3d 859, 876 (6th Cir. 2020). Such testimony, if offered in general terms, does not go to the defendant's state of mind. *See id.* at 876–77 (opinion that "marijuana was packed for resale" did not go to defendant's intent to distribute marijuana).

The United States makes much of Mr. Lindsay's choice of the word "attitude." [*See* R. 321 at 2.] It believes that Mr. Lindsay is opining on what inmates think rather than what they do. *Id.* But the opposite conclusion could also be true. By saying that the attitude among inmates is to join a gang or go alone, Mr. Lindsay could be relating, from his experience, that inmates frequently choose to join gangs. Ultimately, the statement describes a common occurrence in prisons. As the Court explained at the final pretrial hearing, the distinction that the United States hopes to draw is one of semantics.

Instead, the critical distinction is whether Mr. Lindsay will encroach upon the province of the jury. So long as an expert does not explicitly direct a jury to reach an improper conclusion, the jury is free to decide whether the defendant intended to engage in the same practices described by the expert. *Dunnican*, 961 F.3d at 877. The same is true, here. Mr. Lindsay is free to opine on whether inmates commonly join a gang, and the United States is free to attack the persuasiveness of his testimony during cross.

Similarly, the Government wishes to exclude Mr. Lindsay's opinions in paragraphs 24 and 25. [R. 290 at 13–15.] Given Mr. Shaver's response, it appears that he will only seek to introduce the following portion at trial: "In the high security world of USPs, it is extremely

7

unlikely there would be communication regarding internal gang politics between White and Black inmates. . . . The fact of the matter is in USPs, there is very limited interaction between races." [*See* R. 303 at 8; R. 290-1 at 5 ¶¶ 24–25.]  The United States opposes this testimony because it suffers from a "vagueness defect" and "is not helpful to the jury because [Mr. Lindsay] does nothing to apply this generalization to the specific facts of this case."  [R. 290 at 14; R. 321 at 5–6.]

The Court will defer ruling on this statement until trial because the parties' briefing provides little context on how it might be used.  The Government speculates that "this relates to potential testimony from an African-American inmate about statements the Defendant made." *Id.* at 13–14.  And Mr. Shaver's response provides no further clarity.  [R. 303 at 8.]  Accordingly, the Court cannot determine whether this testimony will assist the trier of fact.

However, the Court can settle one issue that the Government raises.  It argues that Mr. Lindsay cannot offer reliable testimony on the common practices of inmates at USP McCreary because his experience was in two different USPs.  [R. 290 at 14.]  Relatedly, it suggests that Mr. Lindsay's experience in two USPs does not qualify him to opine on what goes on in federal prisons generally.  *Id.*  These objections go to the persuasiveness of Mr. Lindsay's testimony rather than its admissibility under *Daubert*.  *See In re Scrap Metal*, 527 F.3d at 529 (credibility and accuracy are not at issue, only reliability).  Mr. Lindsay is entitled to draw upon his experience to offer general observations about prison.  If the United States questions their applicability to life in USP McCreary, it should do so via cross examination.

## 2

Moving to the United States's other issues with Mr. Lindsay's testimony, the Court will not resort to the drastic measure of excluding evidence based on deficiencies in Mr. Lindsay's

disclosures.  Federal Rule of Criminal Procedure 16 governs disclosures in criminal cases.  Upon the Government's request, the defendant must disclose information regarding his expert witnesses.  Fed. R. Crim. P. 16(b)(1)(C)(i).  Among other things, this includes a statement of the expert's opinions that the defendant will elicit in his case in chief, the bases and reasons for them, and the expert's qualifications.  *Id.* 16(b)(1)(C)(iii).  District courts have discretion to craft a remedy if a defendant fails to comply with Rule 16, including forcing the defendant to make further disclosures, granting a continuance, excluding evidence, or entering any other order that is just under the circumstances.  Fed. R. Crim. P. 16(d)(2)(D); *United States v. Hardy*, 586 F.3d 1040, 1043 (6th Cir. 2009).

The United States asks only for exclusion, "the most serious and least favored" of these remedies.  *United States v. Stone*, 218 Fed. App'x 425, 435 (6th Cir. 2007) (citing *United States v. Ganier*, 468 F.3d 920, 927 (6th Cir. 2006)).  And it does so with trial immediately looming, despite having received Mr. Lindsay's report nearly two years ago.  [R. 303 at 5 n.1.]  During that time, it could have sought a less drastic remedy, such as an order compelling further disclosure.  For this reason alone, the Court is disinclined to resort to exclusion.

Moreover, the Government's remaining Rule 16 arguments are not compelling.  After Mr. Shaver agreed to withdraw some portions of the report, the United States identified disclosure issues with four sections that remain.  [R. 321 at 3 (discussing paragraph 14 of the report), 3-4 (paragraph 16), 4-5 (paragraphs 23 and 27), 5-6 (paragraphs 24 and 25).]  These objections contain common themes.  At times, the Government complains that Mr. Lindsay uses a vague or insufficiently defined term.  *Id.* at 4 (paragraphs 23 and 27); [R. 290 at 14 (paragraphs 24 and 25).]  It also claims that Mr. Lindsay fails to reveal the basis for his opinions.  [R. 321 at 3 (paragraph 14), 4-5 (paragraphs 23 and 27); R. 290 at 14 (paragraphs 24 and 25.]  Finally, the

9

United States argues that Mr. Lindsay did not give notice of how his opinions will be relevant at trial by applying them to the facts of the case.  [R. 321 at 3 (paragraph 14), 3-4 (paragraph 16).] None of these reasons are sufficient to exclude Mr. Lindsay's testimony.

The Government's assertion that Mr. Lindsay's terminology is so vague that it cannot prepare to cross examine him strains credulity.  Most of its objections pertain to the words "common" and "uncommon." *E.g., id.* at 4.  The Government claims that, from these words, it cannot tell whether Mr. Lindsay believes something "happens more often than not . . . ." *Id.*  The Government would prefer a more precise statement, such as "more than 10 percent . . . ."  [R. 290 at 15.]  But Mr. Lindsay is basing his opinions on his experience as a warden, not on scientific data.  [R. 303 at 4.]  As the Defense stated during the final pretrial, Mr. Lindsay is not relying on a data set when he uses the term common.  He is relying on his experience as a warden.  Despite its protestations to the contrary, the United States should address these concerns through cross examination.

Likewise, the Government's claim that Mr. Lindsay has failed to disclose the basis for his opinions mistakenly assumes that he must have some data underlying his report.  For example, the Government argues that Mr. Lindsay did not disclose how he formed his opinion that most prisoners join gangs.  [R. 321 at 3.]  It suggests that he must have interviewed gang members, looked over BOP data, or conducted inmate surveys.  *Id.*  Again, the Defense clarified during the final pretrial that none of these occurred.  Instead, Mr. "Lindsay's opinions are based on his review of the evidence . . . and his 32 years of working in corrections as a practitioner and consultant."  [R. 303 at 2.]  Accordingly, this issue is not about disclosure.  Experts like Mr.

Lindsay can base their conclusions on their experience alone.[2]  *See Nemir v. Mitsubishi Motors Corp.*, 200 F. Supp. 2d 770, 774 (E.D. Mich. 2002).

Last, the United States argues that Mr. Lindsay's report violates Rule 16 by not disclosing to whom his opinions might apply at trial.  For example, it states that Mr. "Lindsay does not opine whether any person relevant to this case is or is not like 'most inmates' in terms of his 'attitude' toward gang membership."  [R. 321 at 3.]  It is unclear how this creates a disclosure issue.  The rule only requires a "complete statement of opinions" and "the bases and reasons for them."  Fed. R. Crim. P. 16(b)(1)(C)(iii).  It does not explicitly require the expert to apply a general opinion to a specific party.  *See id.*  Moreover, this argument is entirely inconsistent with the Government's related objections that Mr. Lindsay should not be permitted to testify to Mr. Shaver's subjective intent.  [*See* R. 290 at 6 ("Nothing in Lindsay's training or experience renders him qualified to determine the Defendant's subjective intent for declining to answer questions . . . .").]  The application and relevance of Mr. Lindsay's opinions is more properly a matter for trial.

The United States raises a variety of concerns with Mr. Lindsay's disclosures.  Perhaps these issues could have required further revelations from Mr. Lindsay as a remedy.  But, after receiving the report nearly two years ago, the United States asks for exclusion on the eve of trial.  Because Mr. Shaver agreed not to elicit the portions of Mr. Lindsays report that raise the greatest concern, the Court will not exclude any further testimony before trial.

---

[2] That said, expert witnesses who rely solely on their experience "must explain how that experience leads to the conclusion reached . . . and how that experience is reliably applied to the facts."  *Thomas v. City of Chattanooga*, 398 F.3d 426, 432 (6th Cir. 2005).  If the Government feels, at trial, that Mr. Lindsay still has not explained the basis for his opinions, it should reraise the issue then or cure the defect via cross examination.

**B**

For his part, Mr. Shaver asks the Court to exclude all Rule 404(b) evidence from trial. The Government plans to introduce several pieces of evidence related to Mr. Shaver's disciplinary track record with the BOP.  [*See* R. 294 at 2; R. 305 at 2.]  During the final pretrial conference, a colloquy with the parties revealed that these prior acts fall broadly into two groups: incidents where Mr. Shaver allegedly possessed a long, metal weapon and incidents where he allegedly acquired razor blades.  The Government claims that it will present evidence that the murder weapon in this case was a long piece of metal sharpened into a shank.  It seeks to admit these records to demonstrate that Mr. Shaver had the ability to obtain such a weapon while incarcerated.

The evidence that Mr. Shaver possessed shanks relates to two events.  The United States plans to introduce a BOP record documenting the recovery of a 15 ¾ inch piece of metal from Mr. Shaver's cell at USP Hazelton on November 29, 2009.  [R. 305 at 2.]  It also intends to present the testimony of officers at the Laurel County Detention Center who witnessed Mr. Shaver in possession of a long metal rod on October 21, 2018, photos of a metal rod and loose piece of metal recovered from his cell that day, and one of the pieces of metal as a physical exhibit.  *Id.*

As to the razor blades, the United States included a redacted copy of Mr. Shaver's "Chronological Disciplinary Record" in its 404(b) notice.  *Id.*; [R. 294-2.]  It claims that the report reveals three occasions, February of 2009, November of 2011, and May of 2012, on which Mr. Shaver admitted possessing a dangerous weapon while in custody.  [R. 305 at 2; R. 294-2 at

2, 16.]  During the final pretrial, the parties agreed that these incidents relate to razor blades or another unknown weapon, not shanks.[3]

Mr. Shaver offers three reasons to exclude this evidence.  First, he argues that the evidence is inadmissible under Federal Rule of Evidence 404.  [R. 294 at 3.]  Second, he claims that the Government did not comply with the Court's standing pre-trial order, which required the United States to give Mr. Shaver reasonable notice of any Rule 404(b) evidence it intends to introduce at trial.  [R. 282 at 1.]  Relatedly, Mr. Shaver claims that, due to late notice from the United States, if the Court admits the evidence, he will need an extension of the current trial date to investigate potential areas to attack this evidence.  [R. 294 at 5–6.]

**1**

The Federal Rules of evidence generally prohibit the admission of evidence of a crime or other misdeed to demonstrate a character trait and suggest that on a particular occasion the person acted in accordance with that trait.  Fed. R. Evid. 404(b)(1).  However, this evidence may be admitted for a different purpose, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or accident."  *Id.* 404(b)(2).  To decide whether to admit past acts evidence, a district court uses a three-step process:

> *First*, the district court must decide whether there is sufficient evidence that the other act in question actually occurred.  *Second*, if so, the district court must decide whether the evidence of the other act is probative of a material issue other than character.  *Third*, if the evidence is probative of a material issue other than character, the district court must decide whether the probative value of the evidence is substantially outweighed by its potential prejudicial effect.

---

[3] For the purposes of this analysis, the Court refers to these weapons as razor blades.  At the final pretrial conference, counsel for Mr. Shaver stated that these three incidents all involved razor blades.  The prosecutor agreed that one of the pieces of contraband was a razor blade but that he would need to confirm his records as to the other two.  In the intervening time, the Government has brought the Court nothing further to contradict Mr. Shaver's counsel's assessment that all three BOP violations in this report stemmed from razor blades.  For his part, Mr. Shaver filed a reply brief that states "the U.S. does not even know what the 'weapons' are alleged to be. . . . The defense, also unsure, believes these instances involve razor blades and not shanks."  [R. 307 at 2.]  Accordingly, the weapons are either razor blades or some unknown type.  The analysis, herein, would be the same as to either.

*United States v. Adams*, 722 F.3d 788, 810 (6th Cir. 2013) (quoting *United States v. Jenkins*, 345 F.3d 928, 937 (6th Cir. 2003)).  Ultimately, trial courts have broad discretion to determine the admissibility of Rule 404(b) evidence.  *United States v. Scout*, 509 F.3d 796, 799 (6th Cir. 2007).

Under the first step, the Court must determine whether there is sufficient evidence that Mr. Shaver possessed the contraband at issue.  *See United States v. Qin*, 688 F.3d 257, 262 (6th Cir. 2012) (citing *Huddleston v. United States*, 485 U.S. 681, 685 (1988)).  Sufficient evidence exists if a jury could reasonably find that the prior act occurred by a preponderance of the evidence.  *Huddleston*, 485 U.S. at 690.  This inquiry can frequently be satisfied if the accused admitted to the prior act or a conviction occurred.  *Id.*  The testimony of a single witness is also sufficient for a reasonable jury to conclude that the defendant committed the prior acts.  *United States v. Alkufi*, 636 Fed. App'x 323, 331 (6th Cir. 2016) (quoting *United States v. Sandoval*, 460 F. App'x 552, 562 (6th Cir. 2012)).

The United States intends to lay the foundation for its Rule 404(b) evidence by demonstrating that Mr. Shaver admitted to possessing the weapons at issue or by offering photographs supported by witness testimony.  [R. 305 at 4.]  As to the razor blades, it will rely on Mr. Shaver's BOP disciplinary records, which reflect that he admitted to the incidents.  *Id.* at 2 ¶ 2; *id.* at 4 (citing *United States v. Blankenship*, 870 F.2d 326, 329 (6th Cir. 1988) (accepting disciplinary records as proof of prior bad acts)).  For the shanks, the Government intends to use pictures, physical evidence, and testimony.  [R. 305 at 2 ¶¶ 3–5.]

Mr. Shaver disputes possessing the contraband at issue in all five incidences.  [R. 294 at 3–4.]  During the final pretrial conference, his attorneys also posited that, with more time, they might be able to uncover evidence that Mr. Shaver gave false admissions.  They speculate that Mr. Shaver might have taken the blame for a fellow inmate.  This line of reasoning misconstrues

the issue.  The Court does not need to find that these prior acts occurred by a preponderance of the evidence.  *See Huddleston*, 485 U.S. at 689 ("We conclude that a preliminary finding by the court that the Government has proved the act by a preponderance of the evidence is not called for . . . .").

Instead, the Court must simply assess whether a reasonable jury *could* conclude by a preponderance of the evidence that the acts occurred.  *Id.* at 690.  Here, the United States offers to present as much evidence, if not more, than prior cases have accepted.  *C.f.*, *Alkufi*, 636 Fed. App'x at 331 (bare testimony of a single witness enough).  If Mr. Shaver believes that he can dispute this evidence, he should do so at trial.  But the Court's role at this stage is not to weigh the credibility of the evidence.  *Huddleston*, 485 U.S. at 690.  Assuming the United States produces the support for its Rule 404(b) evidence that it describes, it will have sufficiently shown that the prior acts occurred to present them to the jury.

The second step requires district courts to consider whether the proposed evidence is probative of an issue other than character.  *Adams*, 722 F.3d at 810.  This standard is met "if (1) the evidence is offered for a permissible purpose, (2) that purpose is in issue, and (3) [is] probative to the purpose for which it is offered."  *United States v. Hardy*, 643 F.3d 143, 150–51 (6th Cir. 2011) (citing *United States v. Jenkins*, 345 F.3d 928, 937 (6th Cir. 2003)).

The United States proposes to offer its Rule 404(b) evidence to demonstrate that Mr. Shaver had the requisite knowledge and opportunity to obtain a weapon like the one used to kill Lance Smith.  [R. 305 at 4.]  These are purposes specifically condoned by the rule.  Fed. R. Evid. 402(b)(2).  Courts also generally accept evidence that a defendant possessed a weapon on a prior occasion to show that he had the opportunity to access a weapon involved in the charged crime.  *See United States v. Slaughter*, 248 Fed. App'x 210, 212 (2d Cir. 2007) ("[U]nder the

15

opportunity exception . . . [e]vidence showing that a defendant possessed a handgun prior to the charged crime is properly admitted to show access to such a weapon."); [*see also* R. 305 at 5–6 (collecting cases).]

At this stage, it is impossible to say with certainty whether Mr. Shaver's ability to obtain a shank like the murder weapon will be at issue. For the purposes of this ruling, the Court will assume that Mr. Shaver will deny possessing the murder weapon. Perhaps the context of trial will necessitate revisiting the issue.[4]

Generally, 404(b) evidence is probative of its purpose if the prior acts are substantially similar and reasonably near in time to the incident at issue. *See Qin*, 688 F.3d at 263. Here, the analysis diverges for the shanks and the razor blades. The perpetrator of this crime used a shank-like piece of metal to kill Lance Smith. [R. 294 at 5; R. 294-1 at 1.] As such, the two incidents involving shanks are extremely similar to Mr. Shaver's alleged possession of a shank on the day that Lance Smith was killed.[5]

The razor blades, however, are less similar. The shanks indicate that Mr. Shaver knew how to fashion or otherwise obtain prisoner-made pieces of metal. During the final pretrial conference, the United States took the position that razor blades can also be fashioned into stabbing weapons in federal prisons. This might be persuasive if the United States alleged that a razor blade killed Lance Smith. It does not. And expanding the subset of prior incidents where Mr. Shaver possessed a weapon beyond one substantially identical to the murder weapon would attenuate the connection to opportunity. Rather than focusing on whether Mr. Shaver had access

---

[4] The Government contends that Mr. Shaver "indicates he intends to contest possessing the murder weapon." [R. 305 at 4 n.2 (citing Shaver's motion).] But Mr. Shaver's motion merely states that he denies possessing the shanks "in the prior instances . . . ." [R. 294 at 4.]

[5] Neither Mr. Shaver's motion nor his reply brief argued that these incidents were too distant in time to be probative. [*See* R. 294; R. 307.]

to the murder weapon, the jury might be tempted to assess the character of a prisoner who is willing to carry multiple types of weapons while incarcerated.  The third step of this analysis further elucidates this problem.

Under the third step, the Court must consider whether the probative value of the shanks and the razor blades is substantially outweighed by their potential prejudicial effect.  *See Adams*, 722 F.3d at 810.  Essentially, this last step is a Rule 403 analysis.  *See Huddleston*, 485 U.S. at 691.  District courts can consider whether the other act evidence is unduly prejudicial, the availability of other means of proof, and when the other acts occurred.  *Alkufi*, 636 Fed. App'x at 333.

Any prejudice of admitting the shanks into evidence will be minimal compared to their probative value.  As the same type of weapon alleged to kill Lance Smith, Mr. Shaver's familiarity with shanks is highly probative.  *See United States v. Stafford*, 232 Fed. App'x 522, 527 (6th Cir. 2007) (possession of same type of contraband days after the crime was highly probative).  Inevitably, showing the jury weapons that Mr. Shaver possessed on a prior occasion will prejudice him to a degree.  But "[t]he mere fact that the evidence paints a defendant in a bad light is not enough to make the evidence unfairly prejudicial under Rule 403."  *Spearman v. United States*, No. 96-1887, 1998 U.S. App. LEXIS 29595, at *19 (6th Cir. Nov. 17, 1998).  Because of their high degree of similarity to the weapon used to kill Lance Smith, the shanks' probative value outweighs their prejudicial effect.  *C.f.*, *id.* at *20 (because an essay about the same weapon involved in the offense showed knowledge, "its probative value outweighed any slight prejudice . . . .").  The Court will admit the evidence related to Mr. Shaver's possession of a shank in November 2009 and in October 2018.

On the other hand, the Court will not admit the evidence in Mr. Shaver's Chronological Disciplinary Record pertaining to razor blades or other unknown weapons.  Because the shanks will come into evidence, admitting the razor blades would be duplicative.  *See* Fed. R. Evid. 403. As discussed above, the shanks give the Government an alternative and highly probative means of demonstrating that Mr. Shaver had the ability to obtain the murder weapon.  As such, the risk that the jury will use the razorblades as impermissible propensity evidence increases.  *See Old Chief v. United States*, 519 U.S. 172, 182–183 (1997) ("If an alternative were found to have substantially the same or greater probative value but a lower danger of unfair prejudice, sound judicial discretion would discount the value of the item first offered . . . .").  Given that the Government will have already shown that Mr. Shaver possessed items like the murder weapon, the jury may be tempted to consider what other relevance the razor blades might have, including as to his character.  For these reasons, the probative value of the razor blades is substantially outweighed by their potential prejudice and they will not be admitted.

**2**

Having determined that the razor blades evidence will not be admitted, the Court finds no issue with the timing of the United States's 404(b) disclosures.  Consistent with Federal Rule of Evidence 404(b)(3), the Court's standing pretrial management order required the Government to give Mr. Shaver reasonable notice of any Rule 404(b) evidence it intends to introduce at trial. [R. 19-1 at 3.]  The rule requires this notice "so that the defendant has a fair opportunity to meet" any Rule 404(b) evidence.  Fed. R. Evid. 404(b)(3)(A).  Indeed, the pretrial notice requirement was included in the rule "to reduce surprise and promote early resolution on the issue of admissibility."  *United States v. Barnes*, 49 F.3d 1144, 1147 (6th Cir. 1995) (quoting Advisory Committee's note (1991 amendment)).

That said, the rule itself gives no guidance as to "at what point, in ordinary circumstances, notice must be given and a response filed." *Barnes*, 49 F.3d at 1148. Instead, trial courts have discretion to determine what constitutes reasonable notice under the circumstances. *Barnes*, 49 F.3d at 1147. If the trial court concludes that the Government did not give reasonable notice, the Rule 404(b) evidence at issue is inadmissible. *Id.*

Here, the Government provided its Rule 404(b) notice to Mr. Shaver on March 14, 2023, four weeks before trial and ten days prior to the final pretrial conference. [R. 305 at 1.] It argues that four weeks is more than reasonable given opinions within this circuit, and indeed within this district, that have accepted far less notice. *See id.* at 9 (citing *United States v. French*, 974 F.2d 687, 694–95 (6th Cir. 1992) (affirming one-week notice); *United States v. Monde*, No. 6:22-cr-074-REW, (E.D. Ky. Dec. 20, 2022) (14 days before trial); *United States v. Vance*, No. 5:20-cr-063-DCR (E.D. Ky. July 22, 2020) (7 days before trial); *United States v. Helton*, No. 0:17-cr-006-DLB (E.D. Ky. Mar. 17, 2017) ("Notice by the date of the Final Pretrial Conference is presumed to be reasonable notice by this Court.")).

Under the present circumstances, four weeks' notice was adequate. The Government indicted Mr. Shaver in 2018, so his two attorneys had nearly five years to investigate this matter. As Mr. Shaver admits, the Government provided him with the BOP reports and related information through the course of discovery. [R. 282 at 2.] While he may have preferred the Government to narrow the scope of potential 404(b) evidence that it might introduce at trial sooner, he fails to show why the Government's notice prevented him from meeting the evidence or litigating its admissibility prior to trial. Indeed, as this discussion shows, Mr. Shaver ably contested the admissibility of the evidence before the final pretrial conference.

19

**3**

Finally, Mr. Shaver argues that he will need additional time to prepare for trial should any Rule 404(b) evidence be admitted.  [R. 294 at 5–6.]  During the final pretrial conference, he argued that he will dispute that he actually possessed any of the weapons in the 404(b) evidence. His attorneys suggested that they would need to interview several, additional incarcerated witnesses.  They speculated that Mr. Shaver may have taken the blame for another inmate. Additionally, their reply briefing on this issue argues that investigating all fifty-two alleged violations in Mr. Shaver's BOP record would have been unduly burdensome prior to receiving the United States's Rule 404(b) disclosure.  [R. 307 at 2.]

The Sixth Amendment to the United States Constitution provides, in part, that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."  U.S. Const. amend. VI.  A refusal to allow a continuance of trial can, in limited circumstances, offend due process by denying a defendant's Sixth Amendment rights.  *See Bennett v. Scroggy*, 793 F.2d 772, 774 (6th Cir. 1986) (citing *Washington v. Texas*, 388 U.S. 14, 19 (1967)).

The denial of a defendant's motion for a continuance "amounts to a constitutional violation only if there is an unreasoning or arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay.'"  *United States v. Warshak*, 631 F.3d 266, 298 (6th Cir. 2010) (quoting *United States v. Gallo*, 763 F.2d 1504, 1523 (6th Cir. 1985)).  A district court only exceeds its discretion to deny a defendant's motion for a continuance if the denial results in "actual prejudice to his defense."  *Id.*  Actual prejudice requires "that a continuance would have

made relevant witnesses available or [would have] added something to the defense." *Id.* (quoting *United States v. King*, 127 F.3d 483, 487 (6th Cir. 1997)).

But a court is not obligated to permit a defendant to "delay trial almost indefinitely on the speculation that some distant witness might provide favorable evidence." *United States v. Sawyers*, 902 F.2d 1217, 1219 (6th Cir. 1990) (quoting *United States v. Rogers*, 755 F.2d 533, 541 (7th Cir. 1985)).  Rather, in determining whether to grant a motion to continue, this Court considers "[1] the diligence of the defense in interviewing witnesses and procuring their presence, [2] the probability of procuring their testimony within a reasonable time, [3] the specificity with which the defense is able to describe their expected knowledge or testimony, [4] the degree to which such testimony is expected to be favorable to the accused, and [5] the unique or cumulative nature of the testimony." *Bennett*, 793 F.2d at 774.

These factors are not mechanical.  *United States v. Whitfield*, 259 F. App'x 830, 838 (6th Cir. 2008).  Indeed, a trial court has traditional discretion in choosing whether to permit a continuance.  *Bennett*, 793 F.2d at 774.  The touchstone in reaching a decision is actual prejudice to the defendant.  *United States vs. King*, 127 F.3d 483, 487 (6th Cir. 1997).  Actual prejudice requires a showing that a continuance will make the witness available and add something to the defense.  *Id.*

Mr. Shaver cannot show actual prejudice because his proposed evidence to rebut his possession of the shanks is entirely speculative.  His counsel have had five years to build a defense on his behalf, largely because of continuances that he requested.  As they admitted during the final pretrial, they had notice of the shanks through discovery well before the United States provided its 404(b) notice.  Given the high degree of similarity between the shanks and the murder weapon, attorneys as experienced as Mr. Shaver's should be expected to research these

two extremely probative pieces of evidence well in advance of trial.  Critically, his attorneys cannot say with certainty that further research will produce exonerating evidence as to the shanks.  Because such speculation is not enough to continue this already long delayed matter, trial will proceed as scheduled.

## C

One of Mr. Shaver's motions in limine concerned photographs of the victim that the United States produced in discovery.  [R. 283.]  The Government possesses over one-hundred-fifty photos of the victim.  *Id.* at 1.  When Mr. Shaver filed his motion, the Government had not specified which photos it might seek to introduce at trial.  *Id.* at 2.  Mr. Shaver asked the Court to review the photos in advance of trial and exclude any duplicative or prejudicial items from trial. *Id.*

During the final pretrial conference, the Government offered to submit the pictures that it intends to use at trial to the Court and to Mr. Shaver in advance.  It made that submission on March 28.  To facilitate review of the photos, the Court ordered Mr. Shaver to specifically list any pictures to which he objects on the record by March 30.  [R. 322.]  That time has passed.  Accordingly, the Court assumes, without deciding, that Mr. Shaver's pretrial concerns regarding the photos of the victim have been rectified.  His motion in limine [R. 283] on this subject will be denied as moot.  He may, of course, raise any new concerns that he may have at trial.

## D

Mr. Shaver also filed a motion in limine that sought to exclude testimony from an inmate, J.W., who claimed to receive a confession from Mr. Shaver.  [R. 278.]  During an interview with Mr. Shaver's counsel, J.W. allegedly claimed that a lieutenant and a jail employee asked him to "find out what you can about the [Kenny Shaver] case" and promised, in exchange, to "help him

out." [R. 278 at 3.]  Mr. Shaver argues that, through J.W., the Government designed a scheme to induce his confession outside of the presence of his counsel, in violation of the Sixth Amendment.  *Id.* at 2 (citing *United States v. Henry*, 447 U.S. 264, 274 (1980)).

The Government requested an extension of time beyond the final pretrial conference to investigate the validity of J.W.'s version of events.  [R. 302 at 2.]  It also suggested that it might forgo calling J.W. as a witness, which would moot Mr. Shaver's motion in limine.  *Id.*  The Court granted the United States's motion for an extension during the final pretrial conference, giving it through March 30 to file a response.  [R. 309.]

Well after that deadline, the United States notified the Court that it contacted J.W.  [R. 328.]  Now, J.W. denies Mr. Shaver's version of events.  *Id.* at 1.  He states that "no employee at the Laurel County Detention Center . . . ever instructed him to 'find out what [he could] about the [Kenny Shaver] case and we'll help you out,' or in any other way instructed or directed him to do anything with respect to obtaining information from" Mr. Shaver.  *Id.*  The Government asks the Court to deny Mr. Shaver's motion in limine.  *Id.* at 2.  It does not, however, indicate whether it will call J.W. as a witness.

At this late hour, the Court is presented with one version of events from Mr. Shaver and quite another from the United States.  It has no means to resolve the dispute before trial.  The admissibility of a confession is a preliminary question that the Court must decide.  Fed. R. Evid. 104(a); *United States v. Shields*, 2016 U.S. Dist. LEXIS 178124, at *10 n.15 (E.D. Ky. Nov. 29, 2016).  The Government bears the burden of proving to the Court that a confession is admissible.  *United States v. Short*, 790 F.2d 464, 468 (6th Cir. 1986).  And the Court must hold any hearing to determine the admissibility of a confession outside of the presence of the jury.  Fed. R. Evid. 104(c)(1).

For these reasons, if the Government intends to call J.W. as its witness, it shall notify the Court on the first day of trial.  At that time, the Court will schedule a hearing, during trial, outside of the jury's hearing, to rule on the admissibility of J.W.'s testimony.

**III**

The Court having resolved the matters discussed in the final pretrial conference, trial remains scheduled to commence on April 11, 2023.  Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** as follows:

1. The United States's Motion in Limine to Limit the Testimony of Cameron Lindsay **[R. 290]** is **DENIED** without prejudice;

2. Mr. Shaver's First Motion in Limine to Exclude 404(b) Evidence **[R. 282]** is **DENIED** as moot;

3. Mr. Shaver's Second Motion in Limine to Exclude 404(b) Evidence **[R. 294]** is **GRANTED** in part and **DENIED** in part.  Evidence from Mr. Shaver's Chronological Disciplinary Record relating to his alleged possession of a razor blade or other unknown weapon in February of 2009, November of 2011, and May of 2012 is **EXCLUDED** from trial;

4. Mr. Shaver's Motion in Limine to Exclude Photos **[R. 283]** is **DENIED** as moot;

5. Mr. Shaver's Motion in Limine to Exclude the Testimony of J.W. **[R. 278]** is **DENIED** without prejudice.

This the 7th day of April 2023.

Gregory F. Van Tatenhove
United States District Judge